**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | |
|---|---|
| Techtronic Power Tools Technology Ltd.; ) | |
| One World Technologies, Inc. d/b/a ) | |
| Techtronic Industries Power Equipment; ) | |
| and Techtronic Cordless GP ) | Civil Action No. _____ |
| ) | |
| Plaintiffs, ) | |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | |
| ) | |
| Harbor Freight Tools USA, Inc.; ) | |
| Michael Buckner; Brent Willey; ) | |
| Brent Gregorich; and Robert Gautsch ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT

Plaintiffs Techtronic Power Tools Technology Ltd., One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment, and Techtronic Cordless GP (collectively "TTI"), by way of the following Complaint, allege as follows:

## INTRODUCTION

1.     This action is brought to stop the unlawful and deceptive scheme by Defendants Harbor Freight Tools USA, Inc. ("Harbor Freight") and former TTI employees Michael Buckner, Brent Willey, Brent Gregorich, and Robert Gautsch (collectively the "Individual Defendants" and, with Harbor Freight, the "Defendants") to bypass the years of investment and research and development required to develop products that can legitimately compete with TTI's product offerings by instead poaching TTI's employees in breach of their contractual commitments and stealing TTI's confidential and trade secret information and its patented designs.

2.      Beginning no later than January 2020, Defendant Gautsch, acting on behalf of Defendant Harbor Freight, began soliciting TTI employees to resign *en masse* from TTI and join Harbor Freight.  Defendants Gautsch and Harbor Freight knew these individuals were contractually bound to post-employment restrictive covenants that preclude them from working for Harbor Freight in a competitive capacity, but nevertheless solicited and induced them to join Harbor Freight in breach of their contractual commitments to TTI.

3.      On information and belief, Harbor Freight and Gautsch encouraged these employees to structure their departures in a manner calculated to maximize the harm to TTI and provide these employees with up-to-date access to TTI's confidential and trade secret information.  Each of the "first wave" of resigning employees (Defendants Michael Buckner, Brent Willey and Brent Gregorich) followed the same deceptive and unethical "playbook" of:

- Providing no advance notification of their impending resignations, precluding TTI from cutting off their access to TTI's confidential and trade secret information while they were operating with divided loyalties;

- Providing no transition period, contrary to professional and industry norms, to maximize the operational disruption caused by their abrupt resignation and prevent any effort by TTI to structure a smooth transition of responsibilities; and

- Refusing to identify their new employer or the nature of their duties in an effort to conceal the breaches of their restrictive covenants.

4.      Although this obstructionism was designed to cause confusion, TTI discovered that the employees were going to work at Harbor Freight after Defendant Michael Buckner bought multiple Harbor Freight power tools and batteries shortly after his departure and received an "employee discount" on one of the purchases.  Defendant Buckner was responsible for these same product lines and offerings at TTI, and his involvement in these product lines with a competitor was and is a straightforward breach of his post-separation restrictive covenants.

5.    TTI also learned that, in the course of his solicitations of TTI employees to induce them to breach their agreements with TTI, Defendant Gautsch repeatedly represented as part of Harbor Freight's recruiting efforts that the company was seeking to significantly expand its power tool and cordless battery product offerings, thereby confirming that Harbor Freight's desire to obtain an unlawful head start is the reason for recruiting these individuals.

6.    TTI then sent a letter to Harbor Freight demanding, among other things, that Harbor Freight identify the duties of Defendants Gautsch, Buckner, Gregorich, and Willey, including an explanation of how their duties were consistent with their post-separation covenants.  Realizing that the gamesmanship surrounding their resignations was not successful, Harbor Freight's response acknowledged that each of the employees was working for Harbor Freight.  But Harbor Freight conspicuously declined to provide a description of their job duties or any explanation of how their duties were consistent with their post-separation covenants, tacitly conceding that it cannot provide any legitimate explanation.

7.    On information and belief, after receiving TTI's demand letter, Defendants Harbor Freight and Gautsch altered the "playbook" for the "second wave" of resigning employees (Scott Brank, Sam Quick, Halle Elliott, and Essam Namouz).  Like the "first wave" employees, each of the "second wave" employees abruptly resigned from TTI with no advance notification or transition period.  However, rather than refusing to disclose their new employer or duties, the new story is that each of these employees is purportedly going to stay at home and not work at all.

8.    The notion that several employees earning six-figure salaries would all resign in close proximity to one another without new jobs lined up, particularly in the middle of a global pandemic and record unemployment (with one going so far as to claim he is draining his 401(k)

for living expenses during this period), is not credible. Furthermore, Elliott's company phone records show that she was talking to Gautsch repeatedly as early as February 2020, before she abruptly converted her work phone to a personal number (which, on information and belief, was done to conceal from TTI her continuing contacts with Gautsch).

9.      On information and belief, the new story advanced by the "second wave" employees is another not-so-clever subterfuge to disguise that these "second wave" employees intend to work for Harbor Freight in breach of their restrictive covenants.

10.     If that were not enough, on information and belief, Defendants Harbor Freight and Gautsch conspired with some or all of the former TTI employees to misappropriate TTI's confidential and trade secret information. In addition to the unlawful and unethical tactics by Defendants, TTI's allegations of trade secret misappropriation are supported by the following facts:

- Without any request by TTI, and inconsistent with TTI's normal practice and in violation of their respective contractual obligations, several employees "wiped" their cell phones prior to turning them in to TTI, attempting to make it impossible for TTI to determine whether they transferred, sent, or otherwise retained copies of TTI confidential and trade secret information prior to the "wipe." These devices were "Employee Storage Devices" that the employees were obligated to turn over to TTI for inspection.

- Although they were in discussions with Defendants Gautsch and Harbor Freight for weeks or months prior to their abrupt resignations, the former employees provided no advance notice to TTI and thus had continued access to TTI's most confidential and trade secret information up until the date of their departure. As to Defendant Buckner, this specifically included detailed salary information for TTI engineers that would be invaluable in recruiting them to a competitor.

- Defendants Harbor Freight and Gautsch have targeted employees possessing confidential and trade secret information relevant to the precise business lines that Harbor Freight is seeking to expand and, on information and belief, has offered them above-market salaries to join Harbor Freight.

- Just a week prior to his resignation, and for no discernible business reason, Scott Brank electronically scanned a hard-copy printout of a confidential and trade secret document that would provide a blueprint to a competitor like Harbor Freight on how to set up a testing lab. His activity is particularly suspicious because Brank would have had access

to an electronic copy of the document through normal TTI systems.  The only apparent reason for going through this exercise is that Brank did not want his access of the document to be reflected on his computer access activity.

- In conjunction with Brank taking this highly confidential trade secret blueprint, on information and belief Defendant Gautsch has been touring TTI's prior testing facility at Pearman Dairy Road in Anderson with an eye toward leasing that space on behalf of Harbor Freight.  That testing facility contains equipment fixtures that are used as part of a testing lab, and the trade secret blueprint misappropriated by Brank is a roadmap that would enable Harbor Freight to quickly establish a testing lab that could gain UL certification and provide a competitive advantage to compete with TTI.  Having the ability to conduct UL certification "in-house" provides TTI with a crucial competitive advantage, by cutting out  the time, expense, and logistics of obtaining third-party UL certification for its new, cutting-edge products.  Harbor Freight gaining access to TTI's testing lab blueprint to move into TTI's old facility is precisely the sort of unlawful "head start" the trade secret misappropriation laws are designed to prevent.

- Similarly, just eight days before Sam Quick's resignation, Quick sent TTI's confidential and trade secret 64-page organizational directory to his personal email account.  The directory contains the names, titles, and reporting structures of TTI employees, and would be invaluable to Defendants Harbor Freight and Gautsch in targeting TTI's employees, particularly when combined with the salary information that Defendant Buckner accessed during his period of divided loyalties.

11.     Similar to its deceptive and unethical conduct in this case, Harbor Freight appears to have a history of deceptive and unlawful business practices, including misleading sales tactics (*Jeffrey Beck v. Harbor Freight Tools USA Inc.*, Case No. 15-cv-000598 (Ohio Ct. Com. Pl. 2015)) and patent infringement (*CXT Sys., Inc. v. Harbor Freight Tools USA, Inc.*, Case No. 2:19-cv-00167 (E.D. Tex. 2019)).

12.     Defendant Harbor Freight's unlawful actions do not stop at anticompetitive behavior and trade secret misappropriation—Harbor Freight also has intentionally and willfully copied TTI's patented designs, as alleged more fully below.  Harbor Freight also is prominently displaying in its stores advertising that contains false and misleading comparative advertising claims with TTI's RYOBI and MILWAUKEE brands, among other products.

13.     In sum, rather than make the investment of time, money, and resources to legitimately develop products that might compete with TTI in the marketplace, Harbor Freight is

trying to take a shortcut by stealing its competitor's patented designs, trade secrets, and employees, in violation of their restrictive covenants.  TTI asks this Court to halt Harbor Freight's unlawful scheme.

## PARTIES

14.    Plaintiff One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment is a Delaware corporation with its principal place of business at 100 Innovation Way Anderson, South Carolina, 29621.

15.    Plaintiff Techtronic Cordless GP is a general partnership formed under the laws of the State of Nevada with its registered office at 100 Innovation Way, Anderson, South Carolina 29621.

16.    Plaintiff Techtronic Power Tools Technology Ltd. is a company of the British Virgin Islands, with its address at PO Box 146, Road Town, Tortola, British Virgin Islands.

17.    Defendant Harbor Freight is a Delaware corporation with its registered agent in South Carolina, Corporate Creations Network Inc., located at 6650 Rivers Avenue, North Charleston, South Carolina 29406.

18.    Harbor Freight transacts business in this judicial district, including at its retail location located at 3035 N. Main St., Anderson, South Carolina 29621.

19.    Defendant Robert Gautsch ("Gautsch") is a former employee of TTI.  On information and belief, Gautsch resides at 1109 Springdale Road, Anderson, South Carolina 29621.

20.    Defendant Brent Gregorich ("Gregorich") is a former employee of TTI.  On information and belief, Gregorich resides at 134 Coppermine Drive, Easley, South Carolina 29642.

6

21.     Defendant Brent Willey ("Willey") is a former employee of TTI.  On information and belief, Willey resides at 4713 Great Oaks, Anderson, South Carolina 29625.

22.     Defendant Michael Buckner ("Buckner") is a former employee of TTI.   On information and belief, Buckner resides at 113 Ashley Road, Clemson, South Carolina 29631.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because TTI's claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, arises under the laws of the United States.

24.     Furthermore, this action for patent infringement arises under the Patent Laws of the United States, 35 U.S.C. §§ 1 et seq., including 35 U.S.C. § 271, which arises at least from Harbor Freight's manufacture, use, importation, sale, and/or offer for sale of certain products that infringe U.S. Design Patent No. D694,597 S ("the '597 patent") entitled "Universal Interface for Accessory Blades."  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

25.     This Court has supplemental jurisdiction over TTI's state law claims because they form part of the same case or controversy within the meaning of Article III of the United States Constitution and 28 U.S.C. § 1367.

26.     Venue is proper in this district because a substantial part of the events and omissions giving rise to TTI's claims occurred in this judicial district.  Venue also is proper with respect to TTI's claims of patent infringement because Defendant Harbor Freight has a regular and established place of business in this judicial district, including its retail location located at 3035 N. Main St., Anderson, South Carolina 29621, and it sells and/or offers for sale of certain products in this judicial district that infringe the '597 patent, as alleged below.

27.     Venue is also proper because all Defendants are residents of South Carolina, and at least one of the Defendants resides in this judicial district.

## FACTUAL ALLEGATIONS

**A.     TTI's Business and Competition with Harbor Freight.**

28.     TTI is in the highly competitive business of designing, developing, marketing, manufacturing, and selling power tools, outdoor products, accessories, hand tools, and storage for "do-it-yourself," professional, and industrial users.  In particular, TTI is an industry leader and innovator in the cordless power tool and battery spaces.  TTI creates and advances cordless technology and innovative product solutions in the home improvement, repair, maintenance, construction and infrastructure verticals.

29.     TTI is an industry leader with brands known throughout the world, including iconic brands such as MILWAUKEE, RYOBI, HOOVER, and DIRT DEVIL, and other brands well-known among tool users, including EMPIRE, IMPERIAL, and STILETTO.

30.     Harbor Freight is one of TTI's direct competitors in the industry.  Harbor Freight is a discount tool and equipment retailer that operates a chain of retail stores, as well as a mail-order and e-commerce business.

31.     On information and belief, Harbor Freight primarily rebrands tools manufactured in Asia under its own brand names.

32.     As a result of years of investment into developing its patented and trade secret designs, technology, and processes, and communicating and training its employees on that information, TTI's product offerings are significantly more advanced than those of Harbor Freight, and TTI enjoys a far better market reputation.  As compared to TTI, Harbor Freight's

current product offerings and expertise, particularly in the power tools and cordless battery lines, are extremely limited.

33.     Harbor Freight is ramping up the development, testing, and production in South Carolina of cordless products that are directly competitive with TTI.  On information and belief, Harbor Freight is trying to catch up to TTI's product offerings and technology without making the same investment of time, resources, and research & development by conspiring with the Individual Defendants to copy TTI's business, including by leasing TTI's old facility in Anderson County (including related equipment/fixtures), hiring away TTI's senior leadership and engineers, and making use of their knowledge of TTI's patented designs and trade secret information to accelerate Harbor Freight's product development and testing capabilities.

**B.     The Individual Defendants' Employment with TTI.**

*i.     Defendant Gautsch*

34.     Defendant Gautsch was employed by TTI as its Senior Vice President of Research & Development and New Markets until his separation in September 2018.

35.     In his capacity as a Senior Vice President, Defendant Gautsch was well aware that each of the Individual Defendants (like Gautsch himself) was subject to various post-separation restrictive covenants, as alleged in more detail below.

36.     Accordingly, although Defendant Gautsch's post-separation restrictive covenants expired in September 2019 (except as to his confidentiality/trade secret obligations), Gautsch knew that by soliciting TTI's current management- and executive-level employees to join Harbor Freight, Gautsch was soliciting and inducing them to breach their contractual commitments to TTI.

ii.    *Defendant Buckner*

37.    Defendant Buckner was employed by TTI as its Vice President of Power Tool Development Engineering.  In that capacity, Buckner managed some of TTI's most sensitive projects on multiple new product development programs as well as supported mature programs; met with institutional customers as part of the sales and development process to learn about the customer's specific requirements and specifications; and supervised a team of approximately 35 employees.  In particular, Buckner concentrated in the area of AC and DC powered products, including a leadership role in the development of high power lithium-ion battery and charger systems.  In this role, Buckner was familiar with TTI's confidential and trade secret information concerning a wide variety of product lines, including development status, technological innovations, new product plans, costs/pricing/margin information, testing results, product sales, and vendor and raw material sourcing.

38.    As part of his leadership role, Buckner was also provided with detailed salaries for every engineer at TTI, including a March 2020 report that he was sent after he had already commenced discussions with Gautsch (without disclosure to TTI).  This information, particularly when combined with the confidential organization chart that Quick emailed to himself, gives Defendant Buckner the ability to aid and abet Defendant Gautsch in his wrongful solicitation practices with respect to TTI employees.

39.    Buckner also attended quarterly executive management team meetings, including the review, development, and discussion of TTI's 3-5 year strategic planning initiatives for its new and existing products.  The quarterly meetings also reviewed the status of product developments, testing, pricing, current and anticipated profit margin information, product timing

and release dates, customer feedback and complaints, and vendor/raw material identification and analysis.

### iii.   *Defendant Willey*

40.    Defendant Willey was employed by TTI as its Director of Engineering.  In that capacity, Willey was responsible for the research, design, and development of consumer power tools and battery charging technology, among other product lines.  Willey provided input into customer and marketing strategies; was responsible and accountable for all technical contributions on these lines, including both new and mature product developments; trained and developed other project engineers; wrote general and detailed specifications for the products within his area of responsibility; and was generally responsible for the status of all projects under his management.  As a management-level employee, Willey was also responsible for managing and supervising a team of less senior engineers under his direction.

41.    In order to carry out his responsibilities, Willey was intimately familiar with TTI's confidential and trade secret information related to the areas under his responsibility, including a three-year strategic plan on all such products and technologies; the status of the development and technological innovations of the products; the development of new products; product testing results; development costs; products sales; margin and pricing information; and vendor and raw material selection and analyses.

### iv.   *Defendant Gregorich*

42.    Defendant Gregorich was employed by TTI as its Director of Engineering—Power Tool.  In that capacity, Gregorich was responsible for the research, design and development of a wide range of power tool products, including battery technology.

11

43.     As a Director-level employee, Gregorich also managed and supervised a team of engineers under his direction.

44.     In order to carry out his responsibilities, Gregorich was intimately familiar with TTI's confidential and trade secret information concerning the product lines within his area of responsibility, including the status of development and technological innovations of the products; costs of development; product testing results; product failure and passing rates; and the product costs, sales, margin, and pricing information.  In addition, he knows the three-year strategic plans for these product lines, including what new products and technologies are under development; anticipated timing and release dates; vendor and raw material sourcing and selection; and testing results.

45.     In sum, as high-level management employees, Defendants Buckner, Willey, and Gregorich each had access to TTI's most highly confidential and trade secret information within their areas of responsibility—precisely the same areas in which Harbor Freight is now seeking to expand.  This information, whether recorded on a tangible/electronic document or "in their heads," is precisely the type of competitive intelligence that would be invaluable to a competitor like Harbor Freight.

46.     Among other things, access to this information would allow Harbor Freight to co-opt TTI's product developments and innovations, try to beat TTI to the market on new product releases, undercut TTI's pricing and margins, bypass years or decades of research & development and the millions of dollars TTI has invested into its products, and permit Harbor Freight to unlawfully try to catch up to TTI's superior product offerings and market position.

C.      **TTI's Protection of its Trade Secrets and the Restrictive Covenants.**

47.      As alleged above, TTI's confidential and trade secret information is essential to TTI's current and continuing business success.

48.      TTI takes reasonable steps to protect the secrecy of its highly proprietary, confidential, and trade secret information including, but not limited to:  password protecting computers and networks so that only users with valid login IDs and passwords can obtain access to such information; limiting employee access to such information based on an employee's specific need to know such information in order to perform their job functions; requiring that employees agree to protect TTI's confidential information and trade secrets; restricting physical access to their offices, IT systems, and manufacturing facilities; maintaining employment policies regarding the protection of  confidential information and trade secrets during employment; requiring the return of such information at the end of an employee's employment; and restricting the disclosure and transmission of their confidential information and trade secrets.

49.      Because of their exposure to TTI's confidential and trade secret information, among other reasons, each of the Individual Defendants entered into an "Agreement Limiting Certain Unfair Activities" (the "Restrictive Covenant Agreement").

50.      Each Restrictive Covenant Agreement was supported by good and valuable consideration, including but not limited to access to the confidential and trade secret information, continued employment, employment in high-level management positions that the Individual Defendants would not have been employed in but-for executing their respective agreements, participation in TTI's bonus plan, and the promise of severance pay on termination other than for cause (as to Defendants Gautsch and Buckner).

51.     Each Individual Defendant acknowledged that the consideration provided by TTI for execution of the Restrictive Covenant Agreement was valuable and sufficient.

52.     TTI complied with the terms of each Individual Defendants' Restrictive Covenant Agreement.

53.     Although there are some minor variations in the forms of the Restrictive Covenant Agreements, the material obligations for purposes of this case are the same in each Agreement. Under their respective agreements, each Individual Defendant agreed not to use or disclose TTI's confidential and trade secret information, and to limited non-solicitation and non-competition covenants.

54.     Section 3 of the Restrictive Covenant Agreement prohibits the employee from using or disclosing TTI's Trade Secrets.  The term "Trade Secret" is defined as having the same meaning as under applicable law.

55.     Section 4 prohibits the employee from using or disclosing the Company's Confidential Information for a two-year period after the employee's separation of employment, "whether such Confidential Information is in Employee's memory is set forth electronically, in writing or other form."

56.     The term "Confidential Information" is defined as:

[I]nformation … which is possessed by or developed for the Company or an Affiliated Company and which relates to the Company's or an Affiliated Company's existing or potential business, which information is not reasonably ascertainable by the Company's or an Affiliated Company's competitors or by the general public through lawful means, and which information the Company or an Affiliated Company treats as confidential, including information regarding the Company's or an Affiliated Company's business affairs, plans, strategies, products, designs, finances, computer programs, research, customers, purchasing, marketing, and other information.

57.     Section 6 requires the employee to return all TTI information (whether or not it rises to the level of confidential or trade secret information) to TTI upon separation of

14

employment.  The employee further agrees that upon separation of employment, the employee

will "present to the Company for inspection and removal of all Company Information (including

Confidential Information or Trade Secrets)" any "Employee Storage Device."  An "Employee

Storage Device" is defined as any computer hard drive or other storage device owned by or

otherwise in the possession or control of the employee.

58.     Section 7 sets forth the employee's undivided duty of loyalty to TTI during the

term of employment.  In particular, the employee agrees to "promptly disclose to the Company

any information that might cause the Company to take or refrain from taking any action or which

otherwise might cause the Company to alter its behavior."  This includes a duty to "promptly

notify the Company at any time that the Employee decides to (1) terminate employment with the

Company or (2) enter into competition with the Company . . . as the Company may decide at

such time to limit, suspend, or terminate Employee's employment or access to the Company's or

Affiliated Company's Confidential Information, Trade Secrets or customer relationships."

59.     As high-level management/executive employees, each Individual Defendant also

agreed to the following limited post-separation restriction on competitive activities:

> Limited Territorial Restriction – Executive and Management Activities. For
> twelve months following the end of his/her employment with the Company, for
> whatever reason, Employee shall not perform services of the type Employee
> performed for the Company during the six-month period immediately preceding
> the end of Employee's employment with the Company as part of the business of
> selling, soliciting the sale of or providing Competing Products in the Restricted
> Territory, or as part of the business of designing, testing, developing or producing
> Competing Products for sale in the Restricted Territory. This Paragraph shall not
> bar Employee from performing clerical, menial or manual labor, and shall apply
> to Employee only if Employee was engaged in executive or management
> activities on behalf of the Company during the final six months of Employee's
> employment with the Company.

60.     Similarly, based on their broad responsibilities over TTI's high confidential and

trade secret product developments, technologies, and other information described above, each

Individual Defendant agreed to the following limited restrictions on post-separation competitive

activities:

> <u>Limited Territorial Restriction – Design, Development, and Production and Testing Activities</u>.  For twelve months following the end of his/her employment with the Company, for whatever reason, Employee shall not perform services of the type Employee performed for the Company during the twelve-month period immediately preceding the end of Employee's employment with the Company as part of the business of designing, testing, developing or producing Competing Products for sale in the Restricted Territory. This Paragraph shall not bar Employee from performing clerical, menial or manual labor and shall apply to Employee only if Employee was engaged in or managed or directed product design, development, production or testing activities on behalf of the Company during the final six months of Employee's employment with the Company.

> 61.     The term "Competing Product" is defined in the Agreement as follows:

"Competing Product" means any product or service which is sold or provided in competition with a product or service that is, as of the end of Employee's employment with Company, either (a) sold or provided by the Company or its Affiliated Companies or (b) is in the process of development for sale by the Company or its Affiliated Companies within twelve months after the end of Employee's employment with Company; provided, however, the term Competing Product is limited to products or services sold or provided in competition with products or services which:

> (i)  Employee sold or provided on behalf of the Company or its Affiliated Companies;

> (ii)  one or more Company employees or business units managed or directed by Employee sold or provided on behalf of the Company or its Affiliated Companies;

> (iii)  were designed, developed, tested, distributed, marketed, provided or produced by Employee (individually or in collaboration with other Company or Affiliated Company employees) or one or more Company or Affiliated Company employees or business units managed or directed by Employee; or

> (iv)  which were designed, tested, developed, distributed, marketed, produced, sold or provided by the Company or its Affiliated Companies with management or executive support from Employee,

at any time during the twelve months immediately preceding the end of Employee's employment with the Company.

62.    As set forth in more detail below, on information and belief, each of the Individual Defendants is performing services of the type they performed for TTI in the six- and 12-month periods preceding their separation of employment, as part of the business of providing, designing, testing, developing, and producing Competing Products (including but not limited to power tools and batteries) for sale within the Restricted Territory within the meaning of the Restrictive Covenant Agreement. Each of the Individual Defendants was engaged in executive or management activities on behalf of TTI during the final six months of their employment with TTI. Each of the Individual Defendants was engaged in, managed, and directed product design, development, production, and testing activities on behalf of TTI during the final six months of their employment with TTI.

63.    The term "Restricted Territory" is defined in the Agreement as follows:

"Restricted Territory" means states, provinces or territories within the United States or other countries in which Employee, or one or more other Company employees or Company business units managed or directed by Employee,

(i) provided products or services on behalf of the Company or Affiliated Company;

(ii) sold or solicited the sale of products or services on behalf of the Company or Affiliated Company;

(iii) or which received management or executive support from Employee provided, sold or solicited the sale of products or services on behalf of the Company or Affiliated Company; or

(iv) provided products or services designed, developed, tested or produced by Employee (either individually or in collaboration with other Company employees) or by one or more other Company employees or business units managed or directed by Employee,

during the six-month period immediately preceding the end of Employee's employment with the Company.

Notwithstanding the above, the term "Restricted Territory" is limited to states, provinces or territories within the United States or other countries in which the Company sold or provided in excess of $500,000 worth or products or services in the six-month period immediately preceding the end of Employee's employment with Company.

64.     South Carolina is a "Restricted Territory" within the meaning of the Restrictive Covenants Agreement as applied to each Individual Defendant.  As alleged above, each Individual Employee, and the employees/business units managed by them, provided products or services on behalf of TTI in South Carolina; the TTI employees and business units in South Carolina received management and executive support from each Individual Defendant in connection with providing products or services on behalf of TTI in South Carolina; and products designed, developed, tested, or produced by each Individual Defendant (individually and in collaboration with their respective teams) were provided in South Carolina.  TTI also sold or provided in excess of $500,000 worth of products or services in South Carolina within the six-month period immediately preceding the end of each Individual Defendant's employment with TTI.

65.     Each Individual Defendant further agreed that in the event of any actual or threatened breach of the Restrictive Covenant Agreement, TTI may obtain interim or other injunctive relief, in addition to any other available remedies, without the need to post a bond.

**D.     Harbor Freight Conspires With Defendant Gautsch to Copy TTI's Business.**

66.     No later than January 2020, Defendant Gautsch, on behalf of Harbor Freight, began soliciting his former TTI colleagues to resign from TTI and join Harbor Freight.

67.     As a former executive of TTI, Gautsch knew that each of the Individual Defendants (like Gautsch himself) was subject to post-separation restrictive covenants which, among other things, prohibited them from performing services "of the type Employee performed for the Company during the six-month period immediately preceding the end of Employee's employment with the Company as part of the business of designing, testing, developing, or producing Competing Products for Sale in the Restricted Territory."

18

68.     On information and belief, Harbor Freight was also aware of each Individual Defendant's post-separation restrictive covenants through information communicated by Gautsch.  Harbor Freight is also deemed to have knowledge by virtue of Gautsch's status as an agent or employee of Harbor Freight.

69.     In addition, in January 2020 Harbor Freight's in-house counsel was provided written notice of the types of post-separation covenants that high-level employees of TTI have, when another former employee of TTI, Mark Hartman, contacted TTI to inquire about whether he could consult for Harbor Freight.  Hartman was a Vice President of Marketing for TTI, and in that capacity, had access to high-level trade secret and confidential information about TTI's business.  TTI inquired about the exact nature of the planned consulting, provided guidance to Hartman that he could perform such consulting in limited areas that would not violate his restrictive covenants, and copied Harbor Freight's General Counsel on the correspondence, which described the specific covenants.  Hartman later informed TTI that he would not be pursuing the consulting role any further, likely because Harbor Freight concluded that Hartman's consulting role would have limited value to Harbor Freight in its scheme to steal TTI's employees, trade secrets, and patented designs if Hartman were to comply with his restrictive covenants.

70.     Despite their knowledge of each Individual Defendant's restrictive covenants, Defendants Gautsch and Harbor Freight solicited and induced each Individual Defendant to resign from TTI and accept competitive employment with Harbor Freight.

71.     Buckner resigned on March 24, 2020; Willey resigned on April 22, 2020; and Gregorich resigned on April 25, 2020.

72.    On information and belief, Defendant Gautsch told these individuals and others that if they wanted advice on their restrictive covenants, he would put them in touch with Harbor Freight's in-house counsel.

73.    On information and belief, each employee was in contact with Gautsch and Harbor Freight for weeks or months prior to their abrupt resignations from TTI, but never disclosed that they were considering, had decided to, or had agreed to join Harbor Freight. Furthermore, as alleged above, these employees were following guidance and advice provided by Harbor Freight in furtherance of Harbor Freight's interests and against TTI's interests while still employed by TTI and without disclosing their divided loyalties to TTI.  As such, they continued to have uninterrupted access to TTI's most highly confidential and trade secret information up until the day of their termination, including information that TTI would never have allowed them to access had they disclosed they were leaving for a direct competitor.

74.    Each Individual Defendants' failure to disclose that they had decided to leave for a direct competitor was a breach of Section 7 of their Restrictive Covenant Agreement, which required prompt notification precisely so that TTI could decide whether to cut off their access to confidential and trade secret information.  Further, their continued access to such information during this period of divided loyalty was a breach of their common law duty of loyalty to TTI.

75.    On information and belief, each Individual Defendant was further aware that other current employees of TTI intended to leave for Harbor Freight but still had access to TTI's confidential and trade secret information.  Each Individual Defendant further breached Section 7 of their Restrictive Covenant Agreement and duty of loyalty to TTI by failing to disclose this information, which would have altered TTI's behavior, including cutting off the other employees' access to TTI's confidential and trade secret information.

76.    In addition, in breach of their duty of loyalty and contractual duties to TTI, each Individual Defendant's departure was, on information and belief, calculated to maximize the harm to TTI—their new direct competitor.  Each Individual Defendant abruptly resigned with no advance notice and no post-notice transition period, contrary to professional and industry norms. On information and belief, this was done to maximize the operational disruption to TTI and preclude the development of a smooth transition plan.

77.    In further breach of their contractual commitments, and reflecting Harbor Freight's and Individual Defendants' tacit concession that their new employment would be barred under the terms of their Restrictive Covenants Agreement, each Individual Defendant also refused to disclose the identity of their new employer or the nature of their new job duties.

78.    After learning that the Individual Defendants had gone to work for Harbor Freight, TTI sent Harbor Freight and each of the Individual Defendants a letter demanding, among other things, that they explain the nature of their new job duties and how their position with Harbor Freight is consistent with the terms of their post-employment restrictive covenants.

79.    Harbor Freight's incomplete and deceptive response acknowledged that each of the Individual Defendants is employed by Harbor Freight.  However, despite TTI's express demand, Harbor Freight failed to provide any description of the Individual Defendants' job duties or responsibilities, or otherwise explain how their employment with Harbor Freight was consistent with the terms of their post-separation covenants—an admission that their roles with Harbor Freight are competitive and barred by the terms of the covenants.

80.    This conclusion is further supported by Buckner's purchase of Harbor Freight power tools and batteries shortly after resigning from TTI, which could have no purpose other than engaging in a competitive analysis of Harbor Freight's offerings in those product lines.

81.     In addition, on information and belief, Gautsch expressly told at least one of the employees whom he solicited to join Harbor Freight that Harbor Freight saw an opportunity to grow its role in the power tool industry through the acquisition of TTI's employees.

82.     As alleged above, on information and belief, after receiving TTI's demand letter, Harbor Freight and/or Gautsch communicated a new playbook to the "second wave" of resigning employees (Scott Brank, Sam Quick, Halle Elliott, and Essam Namouz).  Each of these employees is subject to substantially the same Restrictive Covenant Agreement as the Individual Defendants.

83.     Brank and Quick resigned from TTI on Saturday, May 16, 2020, Elliott resigned on May 18, 2020; and Essam Namouz resigned shortly thereafter.

84.     Like the "first wave" of employees, these employees resigned without advance notice or a post-notice transition period, maximizing the operational harm and disruption to TTI.

85.     Rather than refusing to identify their new employer or job duties, however, each of the "second wave" employees claimed that they had no new employment lined up and would be staying home for some undefined period of time.

86.     As alleged above, the idea that several professional employees earnings six-figure salaries would all (a) resign in rapid succession with no alternative employment lined up (with one going so far as to claim he is draining his 401(k) for living expenses during this period), (b) without advance notice or a transition period, (c) in the middle of a global pandemic and record unemployment, and (d) in close proximity to three other employees resigning under similar circumstances to join Harbor Freight, is not credible.  Furthermore, Elliott's company phone records show that she was talking to Gautsch repeatedly as early as February 2020, before she

abruptly converted her work phone to a personal number (which, on information and belief, was done to conceal from TTI her continuing contacts with Gautsch).

87.     On information and belief, this implausible explanation is just another subterfuge to disguise that these employees are working for or intend to work for Harbor Freight in breach of their contractual commitments to TTI.

88.     On information and belief, Harbor Freight and Gautsch conspired with some or all of the former TTI employees to misappropriate TTI's confidential and trade secret information, including by the following activities:

- Without any request by TTI, and inconsistent with TTI's normal practice and in violation of their obligations under their respective Restrictive Covenant Agreements, several employees "wiped" their cell phones prior to turning them in to TTI, making it impossible for TTI to determine whether they transferred, sent, or otherwise retained copies of TTI confidential and trade secret information prior to the "wipe." These devices were "Employee Storage Devices" that the employees were obligated to turn over to TTI for inspection.

- Although they were in discussions with Gautsch and Harbor Freight for weeks or months prior to their abrupt resignations, the former employees provided no advance notice to TTI and thus had continued access to TTI's most confidential and trade secret information up until the date of their departure. As to Buckner, this specifically included detailed salary information for TTI engineers that would be invaluable in recruiting them to a competitor.

- Harbor Freight and Gautsch have targeted employees possessing confidential and trade secret information relevant to the precise business lines that Harbor Freight is seeking to expand and, upon information and belief, has offered them above-market salaries to join Harbor Freight.

- Just a week prior to his resignation, and for no apparent business reason, Scott Brank scanned a hard-copy printout of confidential and trade secret document that would provide a blueprint to a competitor like Harbor Freight on how to set up a testing lab. His activity is particularly suspicious as Brank would have had access to an electronic copy of the document through normal TTI systems, so the only apparent explanation for going through the trouble of scanning a hard-copy document into electronic form is that Brank wished to use this information on behalf of Harbor Freight and wanted to escape detection of his activity.

- In conjunction with Brank taking this highly confidential trade secret blueprint, on information and belief Defendant Gautsch has been touring TTI's prior testing facility at

Pearman Dairy Road in Anderson with an eye toward leasing that space on behalf of Harbor Freight. That testing facility contains equipment fixtures that are used as part of a testing lab, and the trade secret blueprint misappropriated by Brank is a roadmap that would enable Harbor Freight to quickly establish a testing lab that could gain UL certification and provide a competitive advantage to compete with TTI. Having the ability to conduct UL certification "in-house" provides TTI with a crucial competitive advantage, by cutting out the time, expense, and logistics of obtaining third-party UL certification for its new, cutting-edge products. Harbor Freight gaining access to TTI's testing lab blueprint to move into TTI's old facility is precisely the sort of unlawful "head start" the trade secret misappropriation laws are designed to prevent.

- Similarly, just eight days before Sam Quick's resignation, Quick sent TTI's confidential and trade secret 64-page organizational directory to his personal e-mail account. The directory contains the names, titles, and reporting structures of TTI employees, and would be invaluable to Harbor Freight and/or Gautsch in targeting TTI's employees, particularly when combined with the salary information that Buckner accessed during his period of divided loyalties.

89.     This Complaint is filed based on the information available to TTI to date. Much of the relevant information is within the exclusive possession of Defendants or was intentionally destroyed by Defendants. TTI anticipates that additional claims may arise during the course of discovery and TTI will amend this Complaint accordingly.

## FIRST CAUSE OF ACTION
(Misappropriation of Trade Secrets – Defense of Trade Secrets Act)
(Against All Defendants)

90.     TTI realleges and incorporates by reference all preceding paragraphs of the Complaint as though set forth fully herein.

91.     TTI is the owner of the trade secret information as set forth above.

92.     TTI's trade secrets relate to, among other things, products used in, and intended for use in, interstate or foreign commerce. Indeed, the products to which TTI's trade secrets relate are sold throughout the United States and worldwide.

93.     During their employment with TTI, Individual Defendants were, in confidence, provided access to TTI's trade secrets, which are not generally known within the industry and are economically valuable to TTI. A significant part of that value derives from the fact that such

information is not generally known by Harbor Freight or other competitors within the industry who could obtain economic value from their use or disclosure.

94.     TTI's trade secrets are the subject of commercially reasonable efforts to maintain their secrecy, as detailed above.

95.     Although TTI cannot determine the full scope of misappropriation prior to discovery as much of the information is within the exclusive possession and custody of Defendants, upon information and belief Individual Defendants have and will continue to use and/or disclose TTI's trade secrets for the benefit of Harbor Freight and to the detriment of TTI.

96.     As alleged above, Individual Defendants were contractually obligated to promptly inform TTI once they had decided to accept employment with a competitor, precisely so that TTI could determine whether to limit or completely cut off their access to TTI's trade secret information.

97.     The Individual Defendants instead left TTI in the dark for weeks or months during their periods of divided loyalty, thereby gaining continued access to TTI's trade secret information.  This includes up-to-date information on new product developments, pricing and margin information, technological innovations, strategic plans, and other trade secret information that would be invaluable to Harbor Freight.

98.     As alleged above, as to Defendant Buckner, this information also included current salary information for TTI engineers which would be invaluable to Harbor Freight and Gautsch in recruiting TTI's employees.

99.     Likewise, shortly before his resignation, Sam Quick sent to his personal e-mail account a comprehensive organizational chart containing the names, titles, and reporting structures of TTI employees.

100.    On information and belief, the information accessed by Buckner and Quick (which would not have been provided to them had they disclosed they were considering or had decided to join Harbor Freight) was disclosed to Harbor Freight and/or Gautsch for use in recruiting TTI's employees.

101.    Similarly, shortly before his resignation, and for no apparent business reason, Scott Brank scanned a document that would have been invaluable to Harbor Freight in moving into and setting up a competing testing lab.

102.    On information and belief, Brank scanned this blueprint document because he was requested to, and did, disclose it to Harbor Freight and/or Gautsch for use as a blueprint in setting up a competitive testing lab for Harbor Freight.

103.    Further, the overall unlawful and unethical course of conduct displayed by Defendants, including the unsanctioned "wiping" of certain phones and related evidence, supports that Defendants are attempting to conceal evidence of wrongdoing.  Likewise, in breach of their contractual duty under the Restrictive Covenants Agreement and duty of loyalty, each Individual Defendant concealed both: (a) his own intent to resign from TTI and join a direct competitor while still having access to confidential and trade secret information, and (b) on information and belief, his knowledge that others with access to TTI's confidential and trade secret information intended to join Harbor Freight.

104.    Furthermore, the nature of Defendants' job duties would inevitably result in their use of TTI's trade secret information.

105.    If Harbor Freight had any legitimate contention that the duties of Individual Defendants are not competitive with TTI, Harbor Freight would have asserted that in response to TTI's demand letter.  Harbor Freight's failure to do so reflects a tacit concession that Individual

Defendants' employment is directly competitive with the product lines that Individual

Defendants worked on while employed by TTI.  Further, the purchases by Buckner of power

tools and batteries, along with the statement by Gautsch that Harbor Freight is looking to expand

its power tool offerings by poaching TTI employees, further supports the conclusion that

Individual Defendants' employment is directly competitive.

106.    As such, this case presents a typical inevitable disclosure case, where the plaintiff

has an employee who knows its trade secrets who later accepts a position with the plaintiff's

direct competitor.  It is simply not possible that Individual Defendants will be able to diligently

perform complex research and development work for TTI's direct competitor on the same

product lines they worked on while employed by TTI without relying on the trade secret

information and knowledge obtained through their employment at TTI.  *See generally Nucor*

*Corp. v. Bell*, 2008 WL 9894350, at *15 (D.S.C. Mar. 14, 2008); *General Elec. Co. v. Uptake*

*Tech., Inc.*, 394 F. Supp. 3d 815, 834 (N.D. Ill. June 25, 2019).  Further, application of the

inevitable disclosure doctrine is particularly appropriate where, as here, there is other evidence of

bad-faith and deceptive conduct.

107.    In addition to economic damages, unless Defendants are enjoined from using or

disclosing TTI's trade secrets, TTI will suffer immediate and irreparable injury including the

irreversible loss of its confidential and trade secret information, customer relationships, its

competitive position and advantage in the marketplace, and associated harm to its market share,

reputation, and goodwill.  TTI seeks a preliminary and permanent injunction against Defendants'

ongoing wrongful conduct.

108.    Defendants' misappropriation of trade secrets is willful and malicious, entitling

TTI to exemplary damages, attorneys' fees, and costs, including costs incurred in conducting the

extensive forensic investigations that have been and will be required to determine the full scope of misappropriation.

### SECOND CAUSE OF ACTION
(Patent Infringement)
(Against Defendant Harbor Freight)

109.    TTI realleges and incorporates by reference all preceding paragraphs of the Complaint as though set forth fully herein.

110.    TTI possesses substantial patent rights, including many patents (both utility and design) registered with the United States Patent and Trademark Office.  This case involves the '597 patent, which is attached hereto as Exhibit A.

111.    Figure 2 of the '597 patent (reproduced below) depicts a top view of a universal interface for accessory blades showing the invention, the bottom view being a mirror image thereof.



FIG. 2

112.    Harbor Freight offers for sale and sells at least the Hercules 1-3/8 in. Carbide Tooth Reduced Neck Cutting Blade (the "Infringing Product").  For purposes of illustration only, below is a side-by-side comparison of the Infringing Product and Figure 2 of the '597 patent:



'597 Patent, Figure 2               Infringing Product

113.    Without permission or license from TTI, Harbor Freight has and is continuing to make, use, offer to sell, sell, and/or import into the United States its counterfeit products that infringe the '597 patent.  Harbor Freight infringes, because from the point of view of an ordinary observer familiar with the prior art, the Infringing Product is substantially similar to the claimed design.  The resemblance is as such that an ordinary observer would likely purchase Harbor Freight's counterfeit product believing it to be TTI's product.

114.    Harbor Freight's acts of infringement of the '597 patent were undertaken without authority or license from TTI in violation of 35 U.S.C. § 271.

115.    TTI has been and continues to be irreparably harmed by Harbor Freight's past and ongoing infringement of the '597 patent.

116.    Harbor Freight's infringement has caused TTI to suffer damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
(Misappropriation of Trade Secrets – South Carolina Trade Secrets Act)
(Against All Defendants)

117.    TTI realleges and incorporates by reference all preceding paragraphs of the Complaint as though set forth fully herein.

118.    TTI is the owner of the trade secret information as set forth above.

119.    During their employment with TTI, Individual Defendants were, in confidence, provided access to TTI's trade secrets, which are not generally known within the industry and are economically valuable to TTI.  A significant part of that value derives from the fact that such information is not generally known by Harbor Freight or other competitors within the industry who could obtain economic value from their use or disclosure.

120.    TTI's trade secrets are the subject of commercially reasonable efforts to maintain their secrecy, as detailed above.

121.    On information and belief Individual Defendants have and will continue to use and/or disclose TTI's trade secrets for the benefit of Harbor Freight and to the detriment of TTI.

122.    As alleged above, Individual Defendants were contractually obligated to promptly inform TTI once they had decided to accept employment with a competitor, precisely so that TTI could determine whether to limit or completely cut off their access to TTI's trade secret information.

123.    Individual Defendants instead left TTI in the dark for weeks or months during their periods of divided loyalty, thereby gaining continued access to TTI's trade secret information.

124.    This includes up-to-date information on new product developments, pricing and margin information, technological innovations, strategic plans, and other trade secret information that would be invaluable to Harbor Freight.

125.    As alleged above, as to Defendant Buckner, this information also included current salary information for TTI engineers which would be invaluable to Harbor Freight and Gautsch in recruiting TTI's employees.

126.    Likewise, shortly before his resignation, Sam Quick sent to his personal e-mail account a comprehensive organizational chart containing the names, titles, and reporting structures of TTI employees.

127.    On information and belief, the information accessed by Buckner and Quick (which would not have been provided to them had they disclosed they were considering or had decided to join Harbor Freight) was disclosed to Harbor Freight and/or Gautsch for use in recruiting TTI's employees.

128.    Similarly, shortly before his resignation, and for no apparent business reason, Scott Brank scanned a document that would have been invaluable to Harbor Freight in moving into and setting up a competing testing lab.

129.    On information and belief, Brank scanned this document because he was requested to, and did, disclose it to Harbor Freight and/or Gautsch for use as a blueprint in setting up a competitive testing lab for Harbor Freight.

130.    Further, the overall unlawful and unethical course of conduct displayed by Defendants, including the unsanctioned "wiping" of certain phones and related evidence, supports that Defendants are attempting to conceal evidence of wrongdoing.  Likewise, in breach of their contractual duty under the Restrictive Covenants Agreement and duty of loyalty, each

Individual Defendant concealed both: (a) his own intent to resign from TTI and join a direct competitor while still having access to confidential and trade secret information, and (b) on information and belief, his knowledge that others with access to TTI's confidential and trade secret information intended to join a direct competitor.

131.    Furthermore, the nature of Defendants' job duties would inevitably result in their use of TTI's trade secret information.

132.    If Harbor Freight had any legitimate contention that the duties of Individual Defendants are not competitive with TTI, Harbor Freight would have asserted that in response to TTI's demand letter and the threat of imminent litigation.  Harbor Freight's failure to do so reflects a tacit concession that Individual Defendants' employment is directly competitive with the product lines that Individual Defendants worked on while employed by TTI.  Further, the purchases by Buckner of power tools and batteries, along with the statement by Gautsch that Harbor Freight is looking to expand its power tool offerings by poaching TTI employees, further supports the conclusion that Individual Defendants' employment is directly competitive.

133.    As such, this case presents a typical inevitable disclosure case, where the plaintiff has an employee who knows its trade secrets who later accepts a position with the plaintiff's direct competitor.  It is simply not possible that Individual Defendants will be able to diligently perform complex research & development work for TTI's direct competitor on the same product lines they worked on while employed by TTI without relying on the trade secret information and knowledge obtained through their employment at TTI.  *See generally Nucor*, 2008 WL 9894350, at *15.  Further, application of the inevitable disclosure doctrine is particularly appropriate where, as here, there is other evidence of bad-faith and deceptive conduct.

134.     In addition to economic damages, unless Defendants are enjoined from using or disclosing TTI's trade secrets, TTI will suffer immediate and irreparable injury including the irreversible loss of its confidential and trade secret information, customer relationships, its competitive position and advantage in the marketplace, and associated harm to its market share, reputation, and goodwill.  TTI seeks a preliminary and permanent injunction against Defendants' ongoing wrongful conduct.

135.     Defendants' misappropriation of trade secrets is willful and malicious, entitling TTI to exemplary damages, attorneys' fees, and costs, including costs incurred in conducting the extensive forensic investigations that have been and will be required to determine the full scope of misappropriation.

### FOURTH CAUSE OF ACTION
(Breach of Contract)
(Against All Individual Defendants)

136.     TTI realleges and incorporates by reference all preceding paragraphs of the Complaint as though set forth fully herein.

137.     Each Individual Defendant entered into a valid and enforceable Restrictive Covenant Agreement with TTI in exchange for good and valuable consideration.

138.     TTI has fully performed its obligations with respect to each Individual Defendant under their respective Restrictive Covenant Agreement.

139.     In spite of TTI's good faith performance, each Individual Defendant has breached his respective Restrictive Covenant Agreement as alleged above and below.

140.     All Individual Defendants except Gautsch have admittedly accepted employment with Harbor Freight less than 12 months after their separation of employment from TTI.

141.     On information and belief, in breach of their Restrictive Covenant Agreement, each Individual Defendant (except Gautsch) is currently providing services to Harbor Freight of

the type that they provided to TTI during their last year of employment with TTI, as part of the business of selling, soliciting the sale of, or providing Competing Products, including but not limited to power tool and battery technology, within the Restricted Territory (as those terms are defined in their agreements).

142.    On information and belief, in breach of their Restrictive Covenant Agreement, each Individual Defendant (except Gautsch) is currently providing services to Harbor Freight of the type that they provided to TTI during their last year of employment with TTI, as part of the business of designing, formulating, testing, developing, or producing Competing Products, including but not limited to power tools and battery technology, for sale in the Restricted Territory.

143.    While Defendants' obstructionism has made it difficult for TTI to identify the nature of Individual Defendants' job duties without formal discovery, Harbor Freight's refusal to describe their job duties in the face of a direct demand letter and the threat of imminent litigation supports the conclusion that Individual Defendants' duties are in breach of their contractual commitments.  Further supporting that conclusion is that shortly after his resignation Buckner purchased competitive power tools and batteries, and Gautsch's statement that Harbor Freight is seeking to expand its power tools capability by hiring TTI's employees.

144.    As to Gautsch, on information and belief, based on the relatively short timeframe between the expiration of his restrictive covenants and the commencement of the scheme to poach TTI's employees, Gautsch had been plotting with Harbor Freight while still bound by and in breach of his restrictive covenants.

145.    All Individual Defendants except Gautsch further breached their Restrictive Covenant Agreement by failing to promptly disclose to TTI that they had decided to resign from

TTI and join a direct competitor, which would have altered TTI's behavior, including cutting off their continuing access to TTI's confidential and trade secret information and arranging for a proper succession and transition plan to minimize the operational disruptions caused by their departures. On information and belief, the reason each Individual Defendant failed to disclose their knowledge was to maintain continuing access to TTI's confidential and trade secret information.

146.    On information and belief, while still employed by TTI, each Individual Defendant except Gautsch further breached their Restrictive Covenant Agreement by failing to disclose their knowledge that other TTI employees with continuing access to TTI's confidential and trade secret information intended to join a direct competitor which, again, would have altered TTI's behavior, including by cutting off their continued access to such information. On information and belief, the reason each Individual Defendant except Gautsch failed to disclose their knowledge was to maintain continuing access to TTI's confidential and trade secret information.

147.    As to Defendant Buckner, TTI further alleges that Buckner breached his confidentiality and non-disclosure covenants by accessing and, on information and belief, disclosing to Harbor Freight and/or Gautsch, confidential and/or trade secret salary information that he would not have had access to had he promptly disclosed his intent to join Harbor Freight.

148.    As a result of Individual Defendants' breaches, TTI has suffered damages in an amount to be proven at trial.

149.    Further pursuant to both express contractual provisions and the general remedies available under the law, TTI is entitled to injunctive relief to prevent further breaches of the Restrictive Covenant Agreements.

150.   TTI further seeks its actual, general, compensatory, incidental, special, and consequential damages related to the Restrictive Covenants Agreement, including attorney's fees and costs to the extent permitted by law or contract, and/or disgorgement or restitution of all amounts paid in consideration of the Restrictive Covenant Agreements.

## FIFTH CAUSE OF ACTION
(Tortious Interference with Contract)
(Against Harbor Freight and Gautsch)

151.   TTI realleges and incorporates by reference all preceding paragraphs of the Complaint as though set forth fully herein.

152.   As alleged above, the Individual Defendants each entered into a valid and enforceable Restrictive Covenant Agreement with TTI.

153.   As alleged above, the Individual Defendants each committed multiple breaches of their contractual duties to TTI.

154.   As a former Vice President at TTI, Gautsch—and by extension Harbor Freight—was aware of the Restrictive Covenant Agreements between Individual Defendants and TTI. Further, as alleged above, Harbor Freight was on notice of TTI's covenants with its employees through the Hartman consulting correspondence.

155.   On information and belief, Harbor Freight and Gautsch, without justification, solicited, induced, encouraged, and intentionally procured Individual Defendants' breaches, including by soliciting, offering, and hiring them for competitive positions despite knowing of their restrictive covenants; encouraging them to use and disclose TTI's confidential information, including in connection with the solicitation of other TTI employees; encouraging them to provide no advance notice of their resignation to TTI in order to maintain their access to confidential information and maximize the operational disruption to TTI caused by their abrupt resignations; and encouraging them not to disclose to TTI their knowledge that other TTI

employees with continuing access to TTI's confidential and trade secret information intended to

resign and join a direct competitor, with no advance notice or transition period.

156.    The Individual Defendants did, in fact, breach their Restrictive Covenant

Agreements, as alleged above.

157.    Defendants Harbor Freight and Gautsch condoned, ratified, assisted, and

benefitted by Individual Defendants' breaches.

158.    As a result of Harbor Freight's and Gautsch's conduct, TTI has suffered harm in

an amount to be proven at trial.

159.    On information and belief, the solicitation, inducement, and encouragement of the

breaches by Harbor Freight and Gautsch was a substantial factor in causing TTI's harm.

160.    The conduct of Harbor Freight and Gautsch was willful, wanton, malicious,

intentional, oppressive, and in reckless disregard of TTI's rights, justifying an award of punitive

and/or exemplary damages.

### SIXTH CAUSE OF ACTION
(Breach of Duty of Loyalty
(Against all Individual Defendants Except Gautsch)

161.    TTI realleges and incorporates by reference all preceding paragraphs of the

Complaint as though set forth fully herein.

162.    By operation of law, while still employed by TTI Individual Defendants owed

TTI a duty of undivided loyalty.

163.    TTI placed special trust and confidence in Individual Defendants, investing

substantial time and resources in them in the form of training, and access to TTI's confidential

and trade secret information, and Individual Defendants accepted such trust and confidence.

164.     While the duty of loyalty does not bar Individual Defendants from pursuing or accepting alternative employment, here Individual Defendants breached their duty of loyalty to TTI by engaging in disloyal acts during their employment with TTI.

165.     Individual Defendants knew for some time that they intended to resign and join a direct competitor, but deliberately structured their abrupt resignations to impose the maximum possible operational disruption on TTI.

166.     Individual Defendants went far beyond merely pursuing an accepting new employment, and instead intentionally and maliciously took action adverse to the interests of TTI during their employment with TTI to sabotage TTI's operations for the benefit of their new employer.

167.     In addition, as alleged above, Individual Defendants ensured their continued access to TTI's confidential and trade secret information by choosing not to disclose their intent to join a competitor and, on information and belief, have and will use and disclose the information they gained during this period of divided loyalties to the detriment of TTI and benefit of Harbor Freight.

168.     Further, on information and belief, while still employed by TTI, each Individual Defendant knew that other TTI employees with continuing access to TTI's confidential and trade secret information intended to join a direct competitor, and to resign with no transition plan in place, but failed to disclose that information to TTI.

169.     As a result of Individual Defendants' actions, TTI has suffered damages in an amount to be proven at trial.

170.    The conduct of Individual Defendants was willful, wanton, malicious, intentional, oppressive, and in reckless disregard of TTI's rights, justifying an award of punitive and/or exemplary damages.

**SEVENTH CAUSE OF ACTION**
(Aiding and Abetting Breach of Duty of Loyalty
(Against Harbor Freight and Gautsch)

171.    TTI realleges and incorporates by reference all preceding paragraphs of the Complaint as though set forth fully herein.

172.    As alleged above, the Individual Defendants (except Gautsch) owed TTI a duty of undivided loyalty and committed multiple breaches of that duty.

173.    Harbor Freight and Gautsch knew that, as employees of TTI, the Individual Defendants owed a duty of undivided loyalty to TTI while still employed by TTI.

174.    On information and belief, Harbor Freight and Gautsch knowingly and intentionally solicited, induced, encouraged, and procured the Individual Defendants' breaches of that duty, including by encouraging or directing them to refrain from providing advance notice to TTI, so as to ensure the Individual Defendants' continued access to TTI's confidential and trade secret information and to maximize the operational disruption to TTI caused by Individual Defendants' abrupt resignations, and by encouraging or directing them to refrain from informing TTI that other employees with continuing access to TTI's confidential and trade secret information intended to resign to join a direct competitor.

175.    As a result of Harbor Freight's and Gautsch's conduct, TTI has suffered harm in an amount to be proven at trial.

176.    On information and belief, the solicitation, inducement, and encouragement of the breaches by Harbor Freight and Gautsch was a substantial factor in causing TTI's harm.

177.    The conduct of Harbor Freight and Gautsch was willful, wanton, malicious, intentional, oppressive, and in reckless disregard of TTI's rights, justifying an award of punitive and/or exemplary damages.

**WHEREFORE**, TTI prays for judgment against Defendants as follows:

A.    Judgment in favor of TTI and against Defendants on all causes of action alleged in the Complaint;

B.    Judgment against Defendants, and those acting in privity or concert with them, for a preliminary and permanent injunction, and other equitable relief in a form to be requested;

C.    An order of specific performance to enforce the terms of each of the Individual Defendants' Restrictive Covenant Agreements;

D.    An award of damages against Defendants, including all actual, general, compensatory, incidental, special, and consequential damages to the extent recoverable under law, including damages for Harbor Freight's infringement of the '597 patent, together with interest and costs under 35 U.S.C. § 284;

E.    Restitution and disgorgement of all amounts paid to the Individual Defendants as consideration for entering into the Restrictive Covenant Agreements;

F.    An award of damages for the unjust enrichment caused by the misappropriation of trade secrets and/or the imposition of a reasonable royalty;

G.    Pre- and post-judgment interest on the damages assessed;

H.    An order that Harbor Freight's patent infringement is willful and that the damages awarded to TTI be trebled;

I.    Punitive and exemplary damages;

J.      Attorney's fees and costs to the extent permitted by law or contract, including 35 U.S.C. § 285; and

K.      Any other relief as the Court may deem just and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted:

s/ Henry L. Parr, Jr.
WYCHE, P.A.
Henry L. Parr, Jr (Fed. Id. No. 2984)
Greg English (Fed. Id. No. 5737)
Camden Massingill (Fed. Id. No. 12105)
hparr@wyche.com
genglish@wyche.com
cmassingill@wyche.com
200 E. Camperdown Way
Greenville, SC 29601
Telephone:  864-242-8200
Facsimile:   864-235-8900

DLA Piper LLP (US)
Sean Cunningham (*pro hac vice to be filed*)
John Fitzsimmons (*pro hac vice to be filed*)
Kevin Harlow  (*pro hac vice to be filed*)
sean.cunningham@us.dlapiper.com
john.fitzsimmons@us.dlapiper.com
kevin.harlow@us.dlapiper.com
401 B Street
Suite 1700
San Diego, CA 92101
Telephone:  619-699-2700
Fax:  619-699-2701

*Attorneys for Plaintiffs*
*Techtronic Power Tools Technology Ltd., One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment, and Techtronic Cordless GP*

Date:  May 26, 2020

Greenville, South Carolina